JOSEPH A. VELEZ
ATTORNEY AT LAW (SBN: 16059)
7272 E. Indian School Rd., Suite 111
Scottsdale, AZ 85251
Tel:  (480) 710-5079
Attorney for Plaintiffs

**IN THE UNITED STATES FEDERAL COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Elvis Garcia, Erika L. Spurgeon, Rivaldo Godinez,<br><br>Plaintiffs,<br><br>v.<br><br>Clayton W. Coady and Madeira Coady; Applewood Animal Hospital, LLC, dba Applewood Pet Resort;  Coady Enterprises Inc., an Arizona corporation,<br><br>Defendants, | No.    2:19-cv-05437-JJT<br><br>**PLAINTIFFS' TRIAL MEMORANDUM OF LAW**<br><br>(Assigned: Hon. John J. Tuchi) |

Plaintiffs' submit their Trial Memorandum of Law pursuant to this Court's order (Doc. 55).

A. *Rivaldo Godinez's FLSA claims*: Plaintiff Rivaldo Godinez worked for approximately a year and half and was never paid overtime by his employer despite working more than 40 hours in a week.  The reason for this was that Plaintiff belonged to a class of workers – undocumented workers with no social security numbers – whom the employer advantageously took advantage of.  Indeed, all of the undocumented employees of Applewood — and there were many according to Applewood's General Manager — were never paid overtime wages solely because they didn't have social security numbers.  Applewood thus has enjoyed a lengthly and prosperous labor cost

1

advantage at the expense of these workers.  As this Court is aware, this is the second FLSA lawsuit (2017 Lawsuit) undersigned counsel has brought against Applewood on behalf of employees who have not received overtime pay.  What is surprising, especially to undersigned counsel, was that the failure to pay Plaintiff Godinez overtime continued <u>after</u> the first FLSA lawsuit was settled (in September, 2017).  But it's even worse than that: the overtime violations of all three Plaintiffs in this action occurred, before, during and <u>after</u> the 2017 Lawsuit.  Defendants have chosen to settle up with Plaintiff Godinez and Plaintiff Garcia for unpaid wages.  Notably, the employer's settlements includes liquidated damages and covers periods dating back to 2016, therefore implicitly acknowledging Applewood's wilful violation.  Wilful FLSA violations result in a 3 year statute of limitations as opposed to the normal 2 year statute of limitations.

Plaintiff Rivaldo Godinez alleges two (2) remaining FLSA violations: *first*, that he is owed the overtime premium (the "half" portion) for the work he did for on-premises pet groomers who Plaintiff contends were joint employers of Applewood.  The FLSA allows for coverage under a joint enterprise theory per 29 C.F.R. §791.2 and *Donovan v. Easton Land & Dev., Inc.*, 723 F.2d 1549, 1551 (11th Cir. 1984).  As an example, if an employee works 30 hours for company "A" in one workweek and also happens to work 20 hours for company "B" in the same work week, the FLSA would permit the combining of those two sets of hours, *i.e.* 50, if the two employers were so tightly economically intertwined that they were for all intents and purposes one employer.  This would result in overtime being owed to the employee.  Plaintiff Godinez will present the evidence that establishes this.

*Second*, while he worked for Applewood (between February 2017 and June, 2018), Defendant provided housing and board to Plaintiff Godinez as part of his compensation and the fair market value of said housing was at least $1066.00 per month and the estimated value of the utilities provided totaled approximately $174 per month.  Therefore, the monthly benefit totaled

$1240 per month. Pursuant to the FLSA, housing and board must be included in calculating an employee's base hourly wage. See 29 U.S.C. §203(m)(1), 29 CFR §778.224(a) and 29 CFR §531.3. Plaintiff seeks that his pay rate be properly recalculated to include the value of the housing he received as part of his work compensation as mandated by the FLSA.

<u>Plaintiff Godinez's 1st Legal Issue: Joint-enterprise/Joint-employment under the FLSA</u>

For approximately nine (9) weeks between February 26, 2017 through April 29, 2017, Plaintiff Godinez worked an *additional* 5 hours per day (25 additional hours per week) for Applewood's on-premises pet groomers, however he was paid separately by the pet groomers at the same $10 hourly rate that Applewood paid him. And whereas Applewood paid him with checks made out in Plaintiff's father's name (Cristobal Godinez), the pet groomers paid him in cash. During this nine week period, Applewood directed Plaintiff Godinez to work three different shifts daily: the 1st shift (from 7am to 9am) in the kennel area, the 2nd shift (from 9 am to 3 pm) doing pet grooming duties for the on-site pet groomers, who were classified as independent contractors and the 3rd shift (3pm to 6pm) to work back in the kennel area. Plaintiff Godinez therefore contends that the hours he worked for the pet groomers should have also been added to his Applewood hours, which in the process would have entitled him to overtime wages since in each of those nine (9) weeks he exceeded 40 hours of work. Applewood claims that the hours Plaintiff worked for the pet groomers should not be added to his regular Applewood hours since that work was for independent contractors.

29 C.F.R. §791.2 addresses the factors to consider to determine if an employee is working under a joint employment arrangement. While the elements necessary to determine if an employee works for a joint employer are similar to those used in assessing an independent contractor classification, the FLSA's joint employment definition is considerably broader, placing special emphasis on how interdependent or integrated the two employers really are. Said another way, "how intertwined are the two employers?"

Discovery produced a troves of evidence establishing the entrenched link between Applewood and its pet groomers and included:

a.) the pet groomers worked on Applewood's property and during the hours that Applewood is open to the public (to downplay this the Defendants will claim that it was in a different building, but it was still on Applewood's property;

b.) Applewood is the only entity that advertises the pet groomers' services (through its website with no mention on Applewood's website that they are separate businesses);

c.) Even though the pet groomers have a certain amount of autonomy and discretion (much like a manager), to arrange an appointment for pet grooming a customer *must* call Applewood's published phone number);

d.) Applewood tracks the pet grooming appointments and provides the entire administrative functions of scheduling for the pet groomers;

e.) all pet grooming customers must pay Applewood and not the pet groomers directly – demonstrating the extensive control Applewood wields over its so called independent businesses;

f.) Applewood mandates a 50-50 split with all the pet groomers and pays them every two weeks, just as it pays many of its employees

g.) Applewood provides many, though not all, of the pet groomers' supplies and equipment,

h.) Applewood instructed Plaintiff Godinez to always keep his "Applewood shirt" on while working for the pet groomers (with Applewood logo),

i.) Plaintiff's pay was the exact $10 per hour while working for pet groomers as it was for working for Applewood,

j.) although the pet groomers primarily paid Plaintiff his wages for his services to the pet groomers, there were numerous instances when Applewood paid him for his pet grooming services (in cash),

k.) Applewood often pulled Plaintiff away from the pet grooming duties to do work for Applewood, then later sent him back to continue doing pet grooming duties, demonstrating the control over Plaintiff's schedule and work duties;

l.) the pet groomers had to provide the grooming services personally,

m.) by arranging to have Plaintiff paid in cash for his services to the pet groomers, Applewood conveniently vitiated the necessity of keeping work records of his duties on behalf of the groomers. Ironically, Applewood didn't produce an employment file for Godinez and only disclosed scant time records belonging to him. For Applewood to point to the fact that they didn't maintain any work records of Godinez while he worked for the pet groomers in support of their argument that he was an employee of a distinct business is disingenuous since they didn't keep many records of him anyway. And paying him in his father's name proves that Applewood sought to create a system to conceal his employment.

Taken together, these facts are more than sufficient to establish that the hours worked for the pet groomers should be counted as hours working for Applewood under a joint employment theory, thus entitling Plaintiff Godinez to overtime wages for this nine week period. Indeed, the circumstances appearing in a.) through m.), *supra*, should suggest to a fact finder that the pet groomers really are not independent businesses. Instead they appear more like skilled workers with a high degree of autonomy. However, autonomy and little oversight does not make one an independent contractor in the face of the elements described in a.) through m.), *supra*.

<u>Plaintiff Godinez's 2nd Legal Issue: Value of the housing increases base hourly wage.</u>

While he worked for Applewood from February 2017 through June, 2018, Defendant provided housing and board to Plaintiff Godinez as part of his compensation. According Clay Coady, the owner of both Applewood and the home that Plaintiff was provided, the fair rental market value of the housing was at least $3200 per month. Defendants try to mislead by claiming that providing housing to its employees was not customary and therefore, should not be be

counted towards Plaintiff Godinez's wages.  However, they omit that Applewood housed several employees in its homes on a regular basis, and instead attempt to emphasize, incorrectly, that Applewood does not customarily provide housing to its staff.  Indeed, two other Applewood workers simultaneously shared the home with Plaintiff, which explains why the amount of $3200 has been divided by 3.  "Customary" is not synonymous with occasional or episodic.  If an employer provides a temporary place of shelter for a displaced worker, that form of short term and episodic shelter would probably not be compensable under the FLSA.  But that's distinguishable from what exists in this case as here you have a multi-year tenancy provided to various other Applewood employees.  Moreover, both Clay Coady and General Manager Roberto De La Torre testified that room and board was part of Plaintiff's compensation.  Therefore, Plaintiff Godinez attributes at least $1066.00 per month to the fair market value of the home and the value of the utilities are estimated at approximately $174 per month.  In sum, the monthly residential benefit totaled $1240 per month ($1066 + $174).  Pursuant to the F.L.S.A., housing and board must be included in calculating the employee's base hourly wage. See 29 U.S.C. §203(m)(1), 29 CFR §778.224(a) and 29 CFR §531.3.

<u>The Calculation</u>: Dividing $1240 per month by 4.33 weeks[1], the weekly benefit of the room and board totals $286.00.  $286.00 then has to be factored into every single week of work for the period of February 2017 through June, 2018 to calculate Plaintiff's true base hourly rate, and consequently the overtime rate and amount owed.  Note: this makes for a *tedious* week by week re-calculation since every pay period's base hourly rate.  Exhibit A to this Memorandum is Plaintiff's calculation of what his base hourly rate should be if the extra $286 were factored into each work week, and consequently what he would be owed if the Court finds that his base hourly rate should have been increased to reflect the weekly benefit of room and board.  The instructive case on this issue is the U.S. Ninth Circuit Court of Appeals' case of *Flores v. City of San*

---

[1] There are 4.33 weeks in a month.

*Gabriel,* 824 F.3d 890, 900 (9th Cir. 2016), cert. denied, 137 S. Ct. 2117 (2017), which addressed whether benefits provided to employees which were not tied to their hours worked should be added towards calculating the employee's regular hourly rate.  The holding in *Flores* was consistent with the Department of Labor's interpretation of §207(e)(2)'s final phrase as set forth in 29 CFR §778.224(a) and which provides, in part: "It is clear that the clause was not intended to permit the exclusion from the regular rate of payments such as most bonuses or the furnishing of facilities <u>like board and lodging which, though not directly attributable to any particular hours of work are, nevertheless, clearly understood to be compensation for services.</u>" (emphasis added).

    The Deposition Testimony on Whether Housing was Compensation to Godinez

  In his deposition, Applewood's General Manager Roberto De La Torre stated that he believed that Plaintiff Godinez was not paid overtime was because he was being provided a residence; that he took no steps to find out if providing Plaintiff a home excused the employer from paying overtime.  And in a "you can't make this up" moment, when asked why Applewood continued to not pay overtime Plaintiff Godinez even <u>after</u> the 2017 FLSA Lawsuit, his answer was an astonishing "**He wasn't worth it.**" (at pg. 144, lines 17-20)[1].

  Applewood's owner, Clay Coady also confirmed that providing the residence to Plaintiff Godinez was regarded as compensation, and not a gift as Defendants seek to characterize it. In his deposition, Mr. Coady stated the following:

  Q: Okay. Here's my question to you. Is it your testimony that you paid Rivaldo – that you compensated Rivaldo with a place to live and food in exchange for overtime?

    Mr. Zwieg: Object to the form. Foundation.

    The Witness (Clay Coady): ***In effect, yes***.

(pg. 53, lines 14-19).

  Later, when questioned by his attorney at his deposition, Mr. Coady again confirmed that

---

[1] 2017 FLSA case #: 2:17-CV-02353-SPL. It resulted in Applewood paying its employees their unpaid overtime.

the room and board was compensation and even suggested that was the reason for not paying Plaintiff Godinez any overtime:

By (Attorney Zweig): Okay. Did you intend that any of your generosity to Rivaldo be considered as part of Applewood's hourly wages? In other words –

A. ***Yes.***

Q: – did you ever tell Rivaldo he'll get paid a certain amount of money per hour and it's a lesser amount because "I'm also personally giving you housing and food"?

A. ***It wasn't a lesser amount. I just wouldn't give him time and a half overtime***.

Despite this evidence, Defendants still would have us believe that room and board was not compensable pursuant to the FLSA nor that it was part of Plaintiff Godinez's compensation.

Finally, Mr. Coady was the owner, or beneficial owner, of the properties that Plaintiff Godinez lived in and testified at his deposition as to their fair market rental values. His testimony regarding the value of his own properties and the fair market rental values is permitted by the holdings in *Atkinson v. Marquart*, 112 Ariz. 304, 541 P.2d 556 (1975); *Madisons Chevrolet, Inc. v. Donald*, 109 Ariz. 100, 505 P.2d 1039 (1973); *King v. O'Rielly Motor Co.*, 16 Ariz. App. 518, 494 P.2d 718 (Div. 2 1972).

Despite Defendants protests, the deposition testimony clearly establishes that providing the residence (room and board) to Plaintiff Godinez was not a gift, but was intended to be part of his pay. As such, the fair market value of the room and board should be added to Plaintiff Godinez's base hourly rate — thereby increasing the amount of unpaid overtime he is owed.

B. *Plaintiff Erika Spurgeon's FLSA claim*: The dates and hours that Spurgeon worked have now been stipulated and are no longer in dispute. Despite almost always working overtime hours, she was not paid time and a half for working hours in excess of 40 per seven (7) day workweek ("overtime"). Plaintiff Spurgeon contends that Defendants agreed to pay her a bi-weekly salary of $1450.00 and informed her that because she was paid a salary she would not be entitled to overtime for working in excess of 40 hours per week. However, the FLSA makes

clear that even salaried employees are required to receive overtime if the employee's duties are non-exempt. The Parties have stipulated that Plaintiff Spurgeon was a non-exempt employee. The threshold question revolves around whether the Defendants agreed to pay Plaintiff Spurgeon a salary or whether she was paid by the hour through some unconventional arrangement that included "gifting" her four (4) additional hours to reach the $1450 per pay period? Defendants gave conflicting and contradictory testimony about the specifics of Plaintiff Spurgeon's pay arrangement. What is clear and undisputed is that despite asserting that Plaintiff Spurgeon was not paid a salary, Defendants nevertheless paid Plaintiff Spurgeon $1450 for the majority of the pay periods. What is also clear and undisputed is that the moment Plaintiff Spurgeon transitioned from working hourly to working under her new pay arrangement (previously she did work hourly), her paystubs ceased to identify the hours she worked and her hourly rate, much like a salaried employee. While Plaintiff unequivocally asserts that she was told she would be paid a salary (and most of the time she did get $1450 per pay period), Applewood still insists she was actually paid $10.50 per hour though no payroll record whatsoever establishes this. Curiously, the only time $10.50/hr appears on an Applewood document is on the spreadsheet they created *after litigation was commenced* to show her pay.

Significance of Not Paying a Fixed Amount to a Salaried Employee Who Works Overtime:

On approximately one-third of Plaintiff Spurgeon's pay periods Applewood paid her less than $1450. When asked about this in their depositions, the employer again gave conflicting and inconsistent explanations. For example, Applewood paid Ms. Spurgeon $1250 on at least three (3) different pay periods, yet her hours ranged from 93.25, to 95 and 96.25. No one at Applewood seemed to be able to explain why, if Ms. Spurgeon was indeed being paid by the hour as they claim she was, did she receive the exact $1250 in those instances despite working varying amounts of hours.

Plaintiff Spurgeon's explanation is simple: she was promised a salary and most of the time Applewood followed through and paid her $1450 per pay period. On occasion — roughly one third of the time — they didn't. By improperly deducting her salary, that is, not paying her

9

a fixed salary of $1450, Defendants failed to honor the fixed salary agreement.  The question then turns to, what does FLSA say is the manner we must calculate what the employee is owed for working overtime in such a situation?  *If* Defendants always paid Plaintiff Spurgeon $1450 per pay period *without* deductions, she would only be entitled to the "half time" premium, that is, the ".5" part of "1.5x".  This rule is know as the floating workweek method of calculating overtime for salaried employees who work in excess of 40 hours per week. However, the floating workweek ("**FWW**") method is <u>not</u> available to employers who fail to pay their salaried employee a *fixed sum* weekly when the employee works overtime See 29 C.F.R. §778.114(a). This failure to pay her a fixed sum every pay period bars the Defendants from availing themselves to the FWW method of calculating overtime, that is, the "half time calculation", but instead must pay Plaintiff Spurgeon the entire "time and one half" (1.5x) for all hours worked in excess of 40 per work week (29 C.F.R. §778.114(a)).

The last legal question at issue is whether the employer's failure to pay overtime was wilful, thus subjecting them to a 3 year statute of limitations rather than a 2 year statute of limitations.  Plaintiffs contend that Defendants knew that they were required by law to pay overtime wages.  Alternatively, the Defendants failed to take reasonable steps to determine if their pay practices complied with the FLSA.  Plaintiffs contend that Defendants wilfully violated the FLSA, entitling them to recover liquidated damages as provided by 29 U.S.C. §216(b) in an amount equal to the unpaid overtime wages for three (3) years from the filing of this lawsuit.

**DATED** this 20th day of May, 2021.

**/s/ Joseph A. Velez**
JOSEPH A. VELEZ
7272 E. Indian School Rd., Ste. 111
Scottsdale, Arizona 85251
480.710.5079
Attorney for Plaintiffs

Copy of the foregoing emailed this 20th day of March, 2021 to:

Jay Zweig, Esq.
BALLARD SPAHR, LLP.
1 E. Washington St., Ste. 2300
Phoenix, Arizona 85004-2555
Zweigj@ballardspahr.com

By: **/s/ Joseph A. Velez**