**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Elvis Garcia, *et al.*, | No. CV-19-05437-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Clayton W. Coady, *et al.*, | |
| Defendants. | |

After holding a bench trial on June 16, 17 and 22, 2021 (Docs. 115, 116, 122, 123), the Court now provides its Findings of Fact and Conclusions of Law.

## I. BACKGROUND

In this dispute, Plaintiffs Elvis Garcia, Rivaldo Godinez, and Erika L. Spurgeon sued Defendants Clayton Coady, Madeira Coady, Applewood Animal Hospital LLC ("Applewood"), and Coady Enterprises Incorporated (collectively, "Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA").

Mr. Coady owns Applewood, which provides lodging, daycare, and grooming services for pets. Applewood employed Ms. Spurgeon and Mr. Godinez as kennel attendants. Ms. Spurgeon worked for Applewood from 2015 through 2019. Applewood and Ms. Spurgeon had three different payment arrangements over the course of her employment. From 2015 through August 2016, Ms. Spurgeon worked part time for $10 per hour. The next period, from September 2016 through approximately November 2018 is the subject of this lawsuit. Ms. Spurgeon contends that Applewood paid her a salary of

$1,450 per pay period, whereas Applewood contends that Ms. Spurgeon remained an hourly employee. Subsequently, from approximately November 2018 until her departure in 2019, Applewood paid Ms. Spurgeon $14.50 per hour.

Mr. Godinez worked for Applewood from approximately March 2017 through June 2018. During his first 9 weeks, Mr. Godinez also worked part-time as an assistant for Leticia Hernandez and Lowaunz Farrow, pet groomers who worked on site at Applewood. The parties dispute whether the pet groomers are Applewood employees or independent contractors as well as whether Applewood and the pet groomers jointly employed Mr. Godinez during that 9-week period. While working for Applewood, Mr. Godinez lived for free in three houses owned by Mr. Coady.

The parties reached a settlement agreement on Plaintiff Elvis Garcia's claims as well as a portion of Mr. Godinez's claims. (Docs. 74, 75.) The Court subsequently held a bench trial on three issues: (1) whether Mr. Godinez should receive overtime compensation under the FLSA for the hours he worked for the pet groomers; (2) if the values of the housing provided by Mr. Coady should be factored into Mr. Godinez's overtime rate of pay; and (3) whether Applewood agreed to pay Ms. Spurgeon a salary from approximately September 2016 through November 2018. In conjunction with the bench trial, the parties filed Trial Memoranda (Docs. 66, 68) and Proposed Findings of Fact and Conclusions of Law (Docs. 67, 69).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Pet Groomers

#### 1. The Pet Groomers Are Independent Contractors

Applewood argues that the pet groomers are independent contractors and thus Applewood is not required to pay Mr. Godinez overtime for the hours he worked for them. Mr. Godinez contends that Applewood owes him overtime because the pet groomers are Applewood employees.

In determining whether a person is an employee or independent contractor, *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748 (9th Cir. 1979) identified the following list of non-exhaustive factors:

> 1) The degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 754.

Neither the presence nor the absence of any individual factor is determinative. The existence of an employer-employee relationship depends "upon the circumstances of the whole activity," *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947), and ultimately, whether, as a matter of economic reality, the individuals "are dependent upon the business to which they render service." *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (quoting *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)).

Here, the evidence shows that the pet groomers are independent contractors. Both Ms. Hernandez and Ms. Farrow testified that they have substantial control over their work at Applewood. The pet groomers set their own prices per animal based on the species and breed. They also can decline to groom a certain animal and have complete control over which days and hours they work at Applewood. Because the pet groomers are paid per animal and receive one hundred percent of all tips, they also have substantial control over their opportunity for profit. Mr. Godinez points out that Applewood receives fifty percent of the pet groomers' fees and that patrons must schedule their pet grooming appointments through Applewood, but these facts do not bear on the issue of control.

The third factor – whether the pet groomer uses her own materials and employs her own assistants – cuts in favor of finding that the pet groomers are independent contractors. While Applewood has at times provided pet groomers with tables, dryers, and shampoo, Ms. Farrow and Ms. Hernandez buy the vast majority of their own equipment, including clippers, scissors, brushes, combs, and many other items. Moreover, the pet groomers hire their own assistants, who are unaffiliated with Applewood. Both Ms. Hernandez and Ms. Farrow hired Mr. Godinez on days where their full-time assistants were unavailable.

The pet grooming service also requires a special skill. Mr. De La Torre explained that customers request specific pet groomers. In contrast to the employee kennel attendants who all do the same job, the pet groomers specialize in grooming certain breeds and are thus not interchangeable.

Finally, the degree of permanence in the relationship between the pet groomers and Applewood illustrates that they are independent contractors. Not only do Ms. Farrow and Ms. Hernandez dictate when they work for Applewood, but Ms. Farrow runs her own grooming business separate from Applewood, which she advertises through social media.

While Mr. Godinez produced evidence that the pet grooming service could be considered an integral part of Applewood's business – it is listed multiple times on Applewood's web page as an offered service – this factor alone is insufficient for the Court to find that the pet groomers are employees rather than independent contractors.

### 2. The Pet Groomers and Applewood Are Not Joint Employers

Furthermore, the Court finds that Applewood and the pet groomers did not jointly employ Mr. Godinez. When Mr. Godinez worked for the pet groomers, his employment was completely separate from his employment with Applewood. To determine whether a joint employment relationship exists, the Ninth Circuit applies a four-factor "economic reality" test that considers whether the employer: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *disapproved of on other grounds*. These factors are not exclusive or "etched in stone," and no one factor is controlling. *Id.*[1]

---

[1] Courts in the Ninth Circuit additionally consider the following factors when determining joint employment:

(1) whether the work was a specialty job on the production line; (2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes; (3) whether the premises and equipment of the employer are used for the work; (4) whether the employees had a business organization that could or did shift as a unit from one worksite to another; (5) whether the work was "piecework" and not work that required initiative, judgment or foresight; (6) whether the employee had an opportunity for profit or loss depending upon the alleged employee's

- 4 -

Here, the pet groomers and Applewood did not have the authority to make employment decisions on behalf of one another. If the pet groomers stopped using Mr. Godinez as an assistant, it would not impact his employment with Applewood. *See Montoya*, 2014 WL 3385116 at *3-4. And as discussed *supra*, the pet groomers make their own personnel decisions.

Accordingly, the pet groomers did not control or supervise Mr. Godinez's schedule or the conditions of his employment with Applewood. The evidence shows that Applewood created Mr. Godinez's schedule each week without input from the pet groomers. Likewise, Applewood was not involved when Mr. Godinez arranged to work for Ms. Hernandez and Ms. Farrow. In fact, Mr. Godinez worked for Ms. Hernandez on multiple days where Applewood did not schedule him to work. Ms. Hernandez testified that she arranged this with Mr. Godinez, separate from Applewood, and drove Mr. Godinez to Applewood because he did not have another form of transportation.

Mr. Godinez points to certain weeks where Applewood scheduled him to work from 7:00 A.M. until 9:00 A.M. and then again from 3:00 P.M. until 6:00 P.M. Mr. Godinez worked for the pet groomers during the gap in between his two shifts, which he contends was Applewood's intent when creating the schedule. However, Mr. De La Torre explained that when Applewood hired Mr. Godinez, Applewood only needed new employees for their busiest hours – when the pets are dropped off in the morning and picked up in the afternoon – so Mr. De La Torre scheduled Mr. Godinez accordingly.

Additionally, the Court is not persuaded by Mr. Godinez's proffered evidence of coordination between the pet groomers and Applewood. Mr. Godinez testified that Mr. De La Torre instructed him to work for the groomers. Mr. De La Torre denies this.

---

managerial skill; (7) whether there was permanence in the working relationship; and (8) whether the service rendered is an integral part of the alleged employer's business.

*Montoya v. 3PD, Inc.*, No. CV-13-8068-PCT-SMM, 2014 WL 3385116 at *3 (D. Ariz. July 10, 2014), *citing Torres–Lopez v. May,* 111 F.3d 633, 638 (9th Cir.1997)

The Court discussed multiple of the Torres-Lopez factors, *supra*, which overlap with some of the factors relevant to whether the pet groomers are independent contractors. As a whole, these factors also dictate finding that the pet groomers and Applewood are not joint employers.

Importantly, the pet groomers support Mr. De La Torre's denial. Ms. Hernandez testified that Mr. Godinez approached her requesting work and Ms. Farrow testified that she hired Mr. Godinez for one or two days after he started working for Ms. Hernandez. Likewise, whereas Mr. Godinez testified that the pet groomers paid him ten dollars per hour, the same rate as Applewood, and that at times Mr. De La Torre paid him on behalf of the groomers, Ms. Hernandez testified that she paid Mr. Godinez a flat rate per day and Ms. Farrow testified that she paid Mr. Godinez on a per dog basis. And again, Mr. De La Torre denies ever paying Mr. Godinez on the pet groomers' behalf.

Finally, Ms. Hernandez and Ms. Farrow did not maintain employment records for Mr. Godinez. Only Applewood maintained such records, which do not include the hours that he worked for the pet groomers.

In sum, the weight of the evidence illustrates that the pet groomers and Applewood were not joint employers of Mr. Godinez. The Court thus finds that Mr. Godinez is not entitled to overtime compensation for the hours he worked for the pet groomers.

**B.     Housing**

The Court further finds that Mr. Godinez is not entitled to have the housing provided by Mr. Coady factored into his overtime rate of pay. Ninth Circuit law is clear that housing will only be factored into wages where it is "customarily furnished." *Walling v. Alaska Pac. Consol. Min. Co.*, 152 F.2d 812, 815 (9th Cir. 1945) Courts understand this to mean that the employer provides "lodging, regularly and indiscriminately, to all of a particular class of employee." *Roces v. Reno Hous. Auth.*, 300 F. Supp. 3d 1172, 1185 (D. Nev. 2018).

Here, the evidence illustrates that lodging was not customarily furnished to Applewood kennel attendants. Mr. Godinez testified that he was not required to live in Mr. Coady's houses. And many kennel attendants, including Ms. Spurgeon, Mr. Garcia, and Ms. Bjerkeseth did not ever live in one of Mr. Coady's homes while working for Applewood. Moreover, Mr. Godinez did not produce evidence that the housing was factored into his wages. Rather, he testified that he was paid the same as the other kennel attendants.

For these reasons, the cost of housing should not be factored into Mr. Godinez's overtime rate of pay.

### C. Erika Spurgeon

Ms. Spurgeon's claim requires the Court to determine whether she was a salaried employee from August 2016 through November 2018. Unlike Mr. Godinez's claims, there is not a legal test to apply. Rather, the Court must determine – based on two highly conflicting sets of testimony – whether Applewood agreed to pay Ms. Spurgeon a salary. Importantly, Ms. Spurgeon has the burden as Plaintiff to prove her case by a preponderance of the evidence.

The parties agree that in 2016, Ms. Spurgeon approached Mr. Coady and Mr. De La Torre about switching to work full time for Applewood. Ms. Spurgeon informed them that in order to sufficiently support herself, she needed to make $1,450 per paycheck. Ms. Spurgeon testified that Mr. Coady accommodated her request by agreeing to pay her a salary of $1,450. Ms. Spurgeon was unequivocal that both Mr. Coady and Mr. De La Torre used the word "salary" during the conversation and that she did not have to work a minimum number of hours to receive her full salary. In fact, she testified that Mr. De La Torre told her that even if she missed a day of work because she was sick, she would still be paid $1,450 as a salaried employee.

Defendants deny this in its entirety. Mr. De La Torre and Mr. Coady both testified that at the initial meeting, Mr. Coady agreed to bump her hourly rate to $10.50 per hour, so that if she worked 60 hours per week, she would make $1,470 per paycheck. Days later, Ms. Spurgeon informed them that she needed to leave each Friday at 4:00 P.M instead of 6:00 P.M., which meant she could only work 58 hours per week and would not make the necessary $1,450. Mr. Coady agreed to compensate Ms. Spurgeon two extra hours per week at her regular rate of $10.50 per hour. This would allow her to make $1,449 per paycheck, which Applewood would bump up to $1,450.

There is evidence that supports each party's version of the disputed agreement between Applewood and Ms. Spurgeon. On multiple occasions, Ms. Spurgeon received

exactly $1,450 without working the agreed upon 116 hours, which suggests that Applewood paid her a salary unconnected to the number of hours she worked per week. Moreover, Sarah Workman, who started to work on Applewood's payroll in Spring of 2017, testified that no one told her that Ms. Spurgeon was an hourly employee who should be compensated for four extra hours per pay period. And both Ms. Workman and Mr. De La Torre paid Ms. Spurgeon $1,450 even where she did not work the requisite hours. Applewood does not have a good explanation for this other than that Mr. De La Torre was inexperienced with payroll and Applewood as a whole was highly unorganized.

However, on multiple other occasions, Applewood paid Ms. Spurgeon significantly less than $1,450 when she had worked less than 116 hours. When asked what she did to remedy these underpayments, Ms. Spurgeon stated that she questioned Mr. De La Torre but he did not provide a satisfactory response. She did not push the issue further out of concern that Applewood would retaliate against her or her partner at the time, Mr. Garcia. Mr. De La Torre testified that Ms. Spurgeon never spoke with him about these downward departures. The Court does not find it credible that Ms. Spurgeon would not take further steps out of concern that Applewood would retaliate against her or Mr. Garcia. The evidence shows, and Ms. Spurgeon testified, that she felt comfortable going to Mr. De La Torre and Mr. Coady and asking them for a raise, which under either party's theory, resulted in a salary or four free hours per pay period. Moreover, Mr. De La Torre was the best man at Ms. Spurgeon's and Mr. Garcia's wedding.

Ms. Spurgeon additionally points out that her paystubs during the time period in question differ from the first and third portions of her employment when all parties agree that she was an hourly employee. Specifically, Ms. Spurgeon's pay stubs during the time period in question do not show her hours worked during the pay period or how those hours are broken down between regular pay rate and overtime pay rate. However, Mr. De La Torre explained that he did not enter Ms. Spurgeon's hours into the Paychex system, and instead entered the amount of money she was to be paid, because he was concerned that

the two gifted hours would be paid at the overtime rate rather than the regular rate, which would have resulted in an overpayment.[2]

The remaining evidence weighs in favor of finding that Ms. Spurgeon was an hourly employee. Applewood always required Ms. Spurgeon to punch in and punch out when arriving and leaving work, which was not required of salaried employees. And Ms. Spurgeon did not produce a single witness to verify that she was a salaried employee. In fact, Ms. Bjerkeseth, the only witness who knew Ms. Spurgeon at the time, testified that Ms. Spurgeon told her that she was being paid an hourly rate of $10.50 and working 58 hours per week because she had to leave at 4:00 P.M. on Fridays. The Court understands that Ms. Bjerkeseth and Ms. Spurgeon are no longer friends and previously litigated against each other in another matter. However, Ms. Bjerkeseth's testimony bolsters Applewood's credibility, particularly where Ms. Spurgeon did not produce witnesses of her own.

Moreover, it appears Ms. Spurgeon's testimony that she did not have an hours' requirement differs from the allegations in her Complaint. Ms. Spurgeon initially alleged that she was required to work 60 hours in order to receive the $1,450. (Ex. 21.) At trial, Ms. Spurgeon testified that her salary did not depend on working a certain number of hours. This change harms Ms. Spurgeon's credibility.[3]

After reviewing the evidence, the Court is left to consider two extremely different sets of facts. While each side's version of events is flawed, Ms. Spurgeon has the burden of proof. All else being equal, she must convince this Court by a preponderance of the evidence that Mr. Coady agreed to pay her a salary in August, meaning that Mr. Coady

---

[2] When questioned by Mr. Velez why he would not just enter the gifted hours as a bonus at the regular rate of $10.50 per hour, Mr. De La Torre again cited his inexperience in managing the payroll. While this is not a convincing explanation, the Court finds that it was reasonable for Mr. De La Torre to use his chosen method to pay Ms. Spurgeon rather than enter the gifted hours as a bonus.

[3] The Court understands that new information comes to light during discovery and that theories of liability may change. However, whether Ms. Spurgeon had an hours' requirement and whether she was paid an hourly wage are not issues that should change based on discovery. The Court does not understand how Ms. Spurgeon could believe she had an hours' requirement when the Complaint was filed but no longer believes that to be the case.

decided to make Ms. Spurgeon the only salaried kennel attendant and pay her $1,450 regardless of the hours that she worked. Based on the evidence presented, the Court does not find it plausible that Applewood would agree to such an arrangement.

Because Ms. Spurgeon has not met her burden of proof, the Court finds in favor of the Defendants.

**IT IS THEREFORE ORDERED** finding Defendants are entitled to judgment on all of Plaintiffs' remaining claims.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment, as follows, and close this case: Judgment is granted in favor of Defendants.

Dated this 14th day of July, 2021.

Honorable John J. Tuchi
United States District Judge